IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:25-CV-00396-KDB-SCR

| | |
|---|---|
| MOON DOT, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE Q SHACK CORPORATION AND DANIEL FERGUSON, <br><br> Defendants. | ORDER |

**THIS MATTER** is before the Court on Plaintiff's Motion for a Preliminary Injunction (Doc. No. 1-5). The Court has carefully considered this motion, the Parties' briefs and exhibits and oral argument on the motion from the Parties' counsel on August 19, 2025. For the reasons discussed below, the Court finds that Plaintiff has not made a sufficient showing of irreparable harm or that the balancing of harms favors the entry of a preliminary injunction. Therefore, the Court will **DENY** the motion.

## I. LEGAL STANDARD

Very recently, the Fourth Circuit Court of Appeals again described the familiar four-factor test for granting a preliminary injunction from *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008), emphasizing that it sets a "high bar." *See Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 2313244, at *2–3 (4th Cir. Aug. 12, 2025). A district court may only grant a preliminary injunction if it determines that the plaintiff has shown (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3)

1

that the balance of equities tips in their favor, and (4) that the injunction is in the public interest. *Id* at *2.

While movants "need not show a certainty of success," *Pashby v. Delia,* 709 F.3d 307, 321 (4th Cir. 2013), in *Bessent* the court explained the uphill battle that a party seeking a preliminary injunction faces:

> In and since *Winter*, the Supreme Court has repeatedly admonished lower courts that a preliminary injunction "is an extraordinary remedy never awarded as of right." *Id.* at 24, 129 S.Ct. 365; *see Benisek v. Lamone*, 585 U.S. 155, 158, 138 S.Ct. 1942, 201 L.Ed.2d 398 (2018) ("extraordinary remedy"); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46, 144 S.Ct. 1570, 219 L.Ed.2d 99 (2024) ("'extraordinary' equitable remedy"). Far from a mainstay in the ordinary course of litigation, a preliminary injunction is "extraordinary and drastic" and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quoting 11A Wright & Miller's Federal Practice & Procedure § 2948 (2d ed. 1995)). As a result, granting a preliminary injunction should be "the exception," not "the rule." *Munaf*, 553 U.S. at 690, 128 S.Ct. 2207.

*Id.* at *3.

Further, "a preliminary injunction can be granted only if every factor is met, [y]et *denying* a preliminary injunction only takes the rejection of a single factor." *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023); *see also Henderson for NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief."). Thus, a court need not consider all four *Winter* factors when denying—but only when denying—a preliminary injunction. Ultimately, the issuance of a preliminary injunction remains within the discretion of the Court upon application of the four factors. *See Winter,* 555 U.S. at 22, 24, 32 (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right.").

## II. FACTS AND PROCEDURAL HISTORY

In 2002, Defendant Daniel Ferguson and Scott Howell formed Q Shack LLC to start a barbeque restaurant in Durham, North Carolina called the Q Shack ("Original Q Shack"[1]). The Original Q Shack opened on February 17, 2003, and has operated continuously to the present day. From the restaurant's inception, the owners used the trademarks THE Q SHACK, a Q Shack logo, and the slogan TENDER AS A MOTHER'S LOVE. Doc. No. 9-1 ("Ferguson Decl.") at ¶¶ 2, 4, 6.

The use of the marks included offering for sale various products including bottled sauces, rubs, and merchandise in connection with the restaurant's operations. Beginning with the opening in 2003, the Original Q Shack applied labels bearing the Q shack logo to squeeze bottles used by patrons at the restaurant and customers at catering events. *See* Ferguson Decl. at ¶ 6 and Doc. No. 9-11. In 2004, the Original Q Shack began selling barbeque sauces and rubs to customers in containers with labels bearing the Q Shack logo. *Id*. at ¶ 10; Doc. No. 25-1 at 2-4. Also, since opening day the Original Q Shack has been selling branded clothing products, such as shirts and hats, at the restaurant. *Id*. at ¶ 6.

The Original Q Shack restaurant was successful, and Howell wanted to expand. In August 2003, Ferguson and Howell, along with Thomas Meyer, founded Q Shack Unlimited ("Unlimited") for the purpose of opening other store locations modeled after the services and products provided by the Original Q Shack. *Id*. at ¶ 9. After Unlimited was formed, Ferguson and Howell converted Q Shack LLC to The Q Shack Corporation and traded their stock in The Q Shack

---

[1] For ease of reference (and because the distinction does not make a substantive difference for the purpose of the pending motion), the Court will use the name "Original Q Shack" to refer to both the corporate entity and the restaurant.

Corporation to Unlimited. *Id*. at ¶ 6. The Parties dispute whether and in what manner the intellectual property assets of The Q Shack Corporation were transferred to Unlimited.

In any event, the venture did not last long. Early in 2005, Howell left Unlimited, and Ferguson and Meyer decided not to continue the enterprise. To separate their affairs, they executed a Stock Redemption Agreement ("SRA") dated April 31, 2005, in which Ferguson surrendered his ownership interest in Unlimited in exchange for 100% of the stock in The Q Shack Corporation, which had continued to own and operate the Original Q Shack restaurant (as a subsidiary of Unlimited). Overall, the agreement separated the Parties' rights and interests such that Ferguson was able to continue operating the Original Q Shack in Durham County, while allowing Unlimited to open restaurants under the same name in other locations outside of Durham County. Specifically, the SRA included the following provisions with respect to Ferguson's operation of the Original Q Shack after the separation:

> 7(a). The Corporation [Unlimited] grants Q Shack Corporation and its permitted successors and assigns the transferable license to use the Intellectual Property in connection with providing restaurant and disposable catering services from one restaurant location, currently located at 2510 University Drive, including the rights to copy, distribute, modify, and create derivative works of any copyrighted material and the right to use the trademarks and logos designated on Exhibit A in connection with the provision of restaurant and catering services. Q Shack Corporation shall be permitted to relocate its business location from 2510 University Drive without violating the rights contained herein, so long as Q Shack Corporation owns and operates only one business location at any time, and such business is located within the confines of Durham County, North Carolina, exclusive of the campus of Duke University.
>
> 7(c). That the Corporation is no longer a party to any of the affairs of Q Shack Corporation, and shall have no right to interfere in such affairs in any respect.
>
> 7(d). That Q Shack Corporation or its successor in interest shall have the sole right to use the terms "original" or "original Q Shack" in connection with any marketing of its restaurant and catering operations from its one business location, currently located at 2510 University Drive.

>    7(e). That Q Shack Corporation or its successor in interest may provide services or products off-site without violating the terms of this license, provided that any off-site catering shall be disposable catering and not full service catering.
>
>    8. Restrictions and Duke Agreement, The Corporation agrees that it shall not operate any Q Shack restaurant or outlet within Durham County, except that it is agreed that the Corporation may operate or license the sale of Q Shack products on any of the campuses of Duke University (hereinafter "Duke") subject to the following [payment scheme for Unlimited to compensate Q Shack Corporation].

Doc. No. 14-7 at 3-4.

After the split, the Original Q Shack continued to provide restaurant services and catering services from the same store location. More specifically, the Original Q Shack continued to sell branded products in its restaurant including barbeque sauces, rubs, and clothing items, such as shirts and hats. *See* Doc. No. 9-13. Also, the Original Q Shack has its own website THEORIGINALQSHACKDURHAM.COM and developed unique trademarks including word marks, logos and slogans such as "THE ORIGINAL Q SHACK"; "STAY ORIGINAL, Y'ALL"; and "IF IT IS SMOKED LOW AND SLOW, IT WILL GO!". Ferguson Declaration at ¶¶ 25.

In February 2024, the Original Q Shack began selling barbeque sauces as part of its online ordering and began selling its barbeque rubs online in May 2024. However, purchases made through this "online store" are in practical effect simply internet-based takeout orders, available only for pickup at the Original Q Shack restaurant. Ferguson Decl. at ¶¶ 27-28; Doc. No. 25-1 at 4. In May 2024, the Original Q Shack began to sell barbeque sauces and rubs at two local Ace hardware stores, which it characterizes as "a form of product placement for advertising of the … restaurant" (in addition to the small revenue generated). *Id*. at ¶¶ 28-29. The label for each bottle of sauce and rub displays the Q Shack logo and mark, but it also prominently displays the Original Q Shack's "Original" marks as well as the "STAY ORIGINAL, Y'ALL" mark. Further, the label includes the restaurant address of the Original Q Shack, the website address

5

THEORIGINALQSHACKDURHAM.COM, and text noting that Dan Ferguson founded the restaurant, which has served its barbeque, etc. "in Durham" since 2003. Unlimited never objected to any product sales by Q Shack. Ferguson Decl. at ¶ 26-28, 30. Indeed, the Original Q Shack and Unlimited coexisted peacefully for nearly twenty years.

In 2017, Moon Dot purchased a Q Shack branded barbeque restaurant in Charlotte from a licensee of Unlimited, and entered into its own licensee agreement with the company. Doc. No. 14. (Amended Complaint) at ¶ 38. On May 2, 2024, Moon Dot purchased from Unlimited all of Unlimited's intellectual property, what it calls the "Q Shack Brand." *Id*. at ¶ 40. This allegedly included Unlimited's license with the Original Q Shack. *Id*. Moon Dot still operates a Q Shack barbeque restaurant in Charlotte, from which it provides restaurant and catering services, and additionally sells merchandise, sauces, and rubs under the Q Shack Brand. Id. at ¶¶ 14. Moon Dot serves customers primarily from North Carolina and South Carolina and provides catering services from its restaurant in those states. *Id*. at ¶ 12.

Moon Dot alleges that at the time of its "brand" purchase Unlimited owned certain intellectual property and federally protected trademarks, including the word mark THE Q SHACK (U.S. Trademark Registration No. 4,751,823); the word mark TENDER AS A MOTHER'S LOVE (U.S. Trademark Registration No. 2,961,808); and the Q Shack Design Mark (U.S. Trademark Registration No. 2,888,680). Amended Compl. at ¶¶ 16-17, 40. Moon Dot has since registered and owns another Q Design Mark (U.S. Trademark Registration No. 7,785,330). *Id*. In addition to these existing federal registrations, Moon Dot has filed a U.S. trademark application to register the word mark THE Q SHACK for barbecue sauce and barbecue dry rub, which is pending (U.S. Trademark Application No. 99/198,399) and has filed a U.S. trademark application to register the word mark THE ORIGINAL Q SHACK for restaurant services and catering services (based on the use of the

6

mark by the Original Q Shack as its licensee) (U.S. Trademark Application No. 99/198,514). *Id*. at ¶ 19. In sum, Moon Dot claims to be the sole owner of the brand, a claim that the Original Q Shack disputes based on its alleged common law trademark rights and the purchase and registration of copyright rights to the Q Shack logo. *Id*. at ¶ 34; Doc. Nos. 9 at 10, 9-14, 9-15.

Even though the Original Q Shack was Unlimited's only licensee after the May 2024 Moon Dot transaction, Moon Dot did not communicate with the Original Q Shack until late 2024, when it advised Ferguson of its ownership of the Q Shack Brand and offered to discuss establishing a new license agreement. Amended Complaint at ¶ 45.) Ferguson referred Moon Dot to its counsel, who communicated with but did not make progress with Moon Dot's counsel. *Id*. at ¶ 48. There is no allegation that in these initial communications Moon Dot raised any complaint concerning the Original Q Shack's sale of sauces or rubs through its online ordering portal (which had been publicly available since February/May 2024 as discussed above) or in Ace Hardware.

Moon Dot alleges that it first became aware of the Original Q Shack's sale of rubs and sauces at Ace Hardware on December 24, 2024. Three days later, on December 27, 2024, Moon Dot's counsel communicated with the Original Q Shack's counsel, offering to enter into a licensing agreement. Again, no mention was made of the sale of branded sauces or rubs, either at the restaurant or in the retail store. The Original Q Shack's counsel responded on January 17, 2025, declining the license, but offering to pursue a "co-existence" agreement. On February 12, 2025, Moon Dot responded to this letter, raising for the first time a complaint about the sale of rubs and sauces at the hardware store. However, this response does not complain about any "online" sales or other sales of pre-packaged sauces or rubs at the restaurant itself (which, again, could have been seen just by going to the public restaurant). *See* Amended Compl. at ¶¶ 50-51; Doc. Nos. 14-10, 14-11, 14-12.

7

Subsequent posturing letters back and forth between the Parties' counsel over the ensuing months failed to resolve the dispute, and this action was filed on May 27, 2025, in the North Carolina Business Court. *See id*. at ¶¶ 51-56. It was subsequently timely removed by the Original Q Shack to this Court. Together with its Complaint, Moon Dot filed a Motion for a Preliminary Injunction seeking, *inter alia*, to:

> 1. Preliminarily enjoin and restrain QSC [Q Shack Corporation] and each of its agents, representatives, employees, officers, attorneys, successors, assigns, affiliates, and any persons in privity or active concert or participation with any of them from using any mark in association with restaurant services, catering services, or pre-packaged rubs or sauces which use would create a likelihood of confusion, mistake or deception with Moon Dot's use of any of the marks of the Q Shack Brand in association with restaurant services, catering services, or pre-packaged rubs or sauces, with such injunction to specifically prohibit, without limitation, QSC's use of any of the marks of the Q Shack Brand in connection with the sale of pre-packaged rubs or sauces or other goods at its restaurant or in retail stores;
>
> 2. Preliminarily enjoin and restrain QSC and each of its agents, representatives, employees, officers, attorneys, successors, assigns, affiliates, and any persons in privity or active concert or participation with any of them from using in commerce, on or in connection with any goods or services or any container for goods, any word, term, name, symbol, or device, or any combination thereof, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of QSC with Moon Dot, or as to the origin, sponsorship, or approval of QSC's goods, services, or commercial activities by Moon Dot;
> ….

Doc. No. 1-5 at 2-3. However, at oral argument, Moon Dot presented a much more limited request; that is, it now seeks only to enjoin the Original Q Shack from selling branded sauces and rubs through "third party retailers," including the two Durham hardware stores currently selling Original Q Shack products.[2]

---

[2] Moon Dot's counsel also briefly mentioned the Parties' dispute concerning the use of the registration symbol ® in Original Q Shack's advertising, but acknowledged that Defendants had already agreed to remedy any remaining use of the symbol. *See* Doc. No. 25-1.

8

An Amended Complaint was filed on July 23, 2025. Doc. No. 14. The Motion for Preliminary Injunction has been fully briefed and the Court heard oral argument on the motion on August 19, 2025. The motion is now ripe for the Court's ruling.

### III. DISCUSSION

As noted above, if a plaintiff fails to establish that it is entitled to a Preliminary Injunction under each of the four *Winter* factors, then the Court cannot issue an injunction. *Winter*, 555 U.S. at 24 (all four requirements must be "clearly" satisfied). Based on the record presented to the Court, it finds that Moon Dot has not shown "irreparable harm" and, relatedly, that the balancing of harms/equities does not favor the entry of an injunction. Thus, no injunction will be issued.[3]

#### A. Irreparable Harm

Moon Dot must make a clear showing that future irreparable harm is likely if an injunction is not entered. As the Supreme Court held in *Winter*, "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (internal citation omitted). The plaintiff must establish that, absent an injunction, it would likely suffer an injury that is "neither remote nor speculative, but actual and imminent" and one that cannot be remedied if a court waits until the end of trial to resolve the harm. *See Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002)). Indeed, the alleged harm

---

[3] Except as they relate to irreparable harm and the balancing of the equities, the Court does not reach nor decide the remaining two factors, likelihood of success on the merits and the public interest. However, with respect to the likelihood of success on the merits, the Court notes that the Parties raise numerous contested issues of fact (including contractual intent) that will ultimately need to be decided based, at least in part, on the credibility of the witnesses. Such issues make determining the Parties' overall "likelihood of success" difficult on the record before the Court.

should be "present or immediate." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

Nevertheless, following the enactment of the Trademark Modernization Act of 2020, a plaintiff seeking a preliminary injunction is entitled to a rebuttable presumption of irreparable harm upon a court's finding a likelihood of success on the merits. 15 U.S.C. § 1116(a). Thus, if (1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm. Even prior to the statute, a rebuttable presumption was sometimes applied because of the nature of the injury in a typical case of trademark infringement. As the Fourth Circuit explained, "[i]nfringement gives rise to irreparable injury, in that plaintiff has lost control of its business reputation …, there is substantial likelihood of confusion of the purchasing public, there may be no monetary recovery available, and there is an inherent injury to the good will and reputation of the plaintiff." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 939 (4th Cir.1995) (quotation marks and citation omitted); *but see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) (traditional four factor test for injunctive relief, including irreparable harm, applies to permanent injunctive relief). Also, reputation is "not calculable nor precisely compensable." *Two Hands IP LLC v. Two Hands Am., Inc*., 563 F. Supp. 3d 290, 300–01 (S.D.N.Y. 2021) (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc*., 754 F.2d 91, 95 (2d Cir. 1985).

The presumption does not apply in this case, however, for two reasons. First, Moon Dot's unreasonable delay in bringing the motion precludes the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury. *See Quince*

*Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("[s]ince an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required.)"; 4 McCarthy on Trademarks and Unfair Competition § 30:48.50 (5th ed.) ("'Irreparable' injury connotes ongoing serious harm that calls for prompt action by the moving party before it can ask the court for an immediate injunction pending trial…[A] significant delay in moving for a preliminary injunction may rebut the statutory presumption of irreparable injury."); *Two Hands*, 563 F. Supp. 3d 300-01 (delay of three months found too long); *Static Control Components, Inc. v. Future Graphics, LLC*, No. 1:06-cv-730, 2007 WL 1447695, *2-3 (M.D.N.C. May 11, 2007) (finding that an eight-week delay weighed against a finding of irreparable harm).

Here, both the long-term acquiescence by Moon Dot's predecessor and its own months-long delay in raising any complaint about the Original Q Shack's sale of branded sauces, rubs and other merchandise preclude a finding of irreparable harm. Since 2004 (before the SRA), the Original Q Shack has been publicly selling branded sauces and clothing at the restaurant, and Unlimited – actually through Meyer and constructively as the corporate parent of its subsidiary – knew about the sales.[4] Then, Unlimited never raised any issue with the sales over the next nearly twenty years. Such a delay is far too long in the context of a request for "urgent" relief. *See Quince Orchard,* 872 F.2d at 80. And Moon Dot has cited no authority (and the Court has found none) that holds that the clock somehow "starts over" with the sale / transfer of the SRA.

---

[4] Moon Dot has not shown a likelihood of success on the argument that the SRA can reasonably be read to prohibit any product sales by the Original Q Shack that were ongoing at the time of the agreement. Therefore, any notice of sales preceding the SRA continued after the Parties split the company.

Moreover, Moon Dot's own lack of diligence does not reflect the need to prevent "imminent" harm. If the Original Q Shack's use of the "Q Shack Brand" were of any significant importance to Moon Dot, it would have at a minimum looked at its website and social media accounts prior to purchasing the brand in May 2024 (over a year prior to filing this action). Had it done so, it would have seen that the Original Q Shack sold branded sauces, rubs, etc. in the store and "online."[5] Further, once it bought the brand, it is not unreasonable that Moon Dot would have visited its only alleged licensee in the months following the sale, which also would have revealed the branded sales of which it now complains. Even more obviously, Moon Dot could have simply asked questions of the Original Q Shack, which it didn't do for months, even after lawyers became involved in November 2024. Then, when lawyers did get involved, they didn't complain about the branded sales immediately after Moon Dot learned of the hardware store sales, waiting nearly two months from December 24, 2024 to February 12, 2025 to even raise the issue (while other communications continued) and letting another three months pass before the lawsuit was filed.[6] In sum, Moon Dot's record of inattention and delay simply does not reflect the urgency required to establish irreparable harm.

Second, Q Shack has rebutted the allegation that Moon Dot has demonstrated a likelihood of confusion. This independently precludes the application of the Trademark Modernization Act's presumption. *See Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*, No. 21-cv-149, 2021 WL

---

[5] The Court does not credit Moon Dot's argument that the fact that the Original Q Shack sold these products was hard to determine online. To the contrary, one of the menu categories across the top of the menu webpage is "Merchandise." Further, Moon Dot does not respond to the evidence that photos of branded rubs were posted on Facebook.

[6] While the Parties were negotiating a potential resolution of their dispute during this time, the amount of the delay (they had been talking since November 2024) still doesn't reflect the urgency Moon Dot now urges on the Court.

1372658, at *12 (S.D.N.Y. Apr. 12, 2021).[7] To rebut the statutory presumption, an accused infringer may "produce argument and evidence either that … [any] likelihood of confusion would not create an appreciable injury to sales, goodwill and reputation or that any such damage could be adequately compensated for by a future award of money to the trademark owner." 4 McCarthy on Trademarks and Unfair Competition § 30:47 (5th ed.); *see Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 184–85 (3d Cir. 2022).

The Original Q Shack has rebutted the application of a statutory presumption of irreparable harm based on the limited sales of branded sauces and rubs at the two Durham hardware stores in several ways. First, while the label for each bottle of sauce and rub displays the Q Shack logo and mark, it prominently displays the Original Q Shack's "Original" marks as well as the "STAY ORIGINAL, Y'ALL" mark. The label also includes the Durham restaurant address, the website address THEORIGINALQSHACKDURHAM.COM, and text describing the founding of the Durham Q Shack location. Therefore, any "likelihood of confusion" as to the source of the products is, at best, uncertain.

Further, Defendants have raised a sufficient question that the hardware store sales[8] will not create an appreciable injury to Moon Dot's sales, goodwill or reputation. Moon Dot concedes that there is no evidence that the Original Q Shack's products or services are of inferior quality, and

---

[7] Because the statute refers to a "rebuttable presumption," Federal rule of Evidence 301 applies. Thus, the presumption shifts the burden of production, not the burden of persuasion. This is sometimes called the "bursting bubble" presumption in that once the opposing party presents rebuttal evidence sufficient to support a contrary finding, the presumption "bursts" like a bubble. Thus, if the presumption is rebutted, the mark holder must present evidence of irreparable harm. *See* 4 McCarthy on Trademarks and Unfair Competition § 30:47 (5th ed.).

[8] The Court finds that Moon Dot has no likelihood of success in establishing that sales of sauces, rubs and promotional products at or from the restaurant itself are not permitted under the SRA; therefore, those sales are not considered here (although they would be unlikely to change the analysis in any event because there would be even less likelihood of confusion as to the source of the products).

13

there is no evidence to suggest that any instances of consumer confusion have caused consumers to alter their purchasing decisions. Indeed, Moon Dot does not (and cannot by agreement) do business in Durham County, North Carolina and there is no evidence that any Moon Dot customer purchased or even saw the sauces or rubs in the Durham hardware store.[9] Without any such evidence, Moon Dot cannot substantiate its assertions that the Defendants' alleged infringement undermines-or results in a loss of control over-its reputation and goodwill. *See Two Hands*, 563 F. Supp. 3d at 300–01. In other words, "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Id.*; *see also Algood Casters Ltd. v. Caster Concepts, Inc.*, No. 20-cv-4623, 2020 WL 5274172, at *4 (S.D.N.Y. Sept. 4, 2020) (noting that the conclusory statements of the movant's president are insufficient to establish irreparable harm).

Therefore, Moon Dot has failed to establish "irreparable harm" sufficient to support entry of a Preliminary Injunction.

### B. Balancing of Harms / Equities

Relatedly, the Court finds that the balance of harms / equities between the Parties with respect to the injunction does not clearly favor Moon Dot. On the one hand, the Original Q Shack will suffer the immediate harm of losing at least some sales and advertising opportunities. Also, being required to immediately remove their products may engender broader questions about the lawfulness and ongoing continuity of their restaurant. On the other hand, any harm to Moon Dot is merely speculative, amounting to a concern not that it will suffer any immediate monetary or reputational harm but rather only that it will somehow "lose control" over its marks. However,

---

[9] Further, Moon Dot has failed to distinguish how it will be irreparably harmed by the sale of the same labeled bottles of sauce or rub from the hardware store rather than from the restaurant, which it doesn't presently challenge.

14

through the SRA, Moon Dot has already lost substantial "control" over the Original Q Shack's use of the marks, to the point where the acknowledged lawful use of the "Q Shack Brand" dwarfs the disputed use. Accordingly, Moon Dot has not established that the balancing of harms/equities supports the granting of a Preliminary Injunction.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Plaintiff's Motion for a Preliminary Injunction (Doc. No. 1-5) is **DENIED;** and
2. If the Parties are unable to resolve their dispute in the Mediation ordered by the Court at oral argument, then this matter will proceed towards a final resolution on the merits.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: August 21, 2025

Kenneth D. Bell
United States District Judge